AO 93 (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
### for the
Middle District of Florida

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br>803 Hunters Court, Brandon, Florida | )<br>)<br>)<br>)<br>)<br>) |

Case No. 8:20MJ1046AAS

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Middle _____ District of _____ Florida _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A-3

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B-3

**YOU ARE COMMANDED** to execute this warrant on or before _February 4, 2020_ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Amanda Arnold Sansone _____
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____

Date and time issued:   _January 21, 2020_ _____ *Judge's signature*

City and state:   _Tampa, FL_ _____ Amanda Arnold Sansone, United States Magistrate Judge
*Printed name and title*

I CERTIFY THE FOREGOING TO BE A TRUE
AND CORRECT COPY OF THE ORIGINAL
CLERK OF COURT
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
BY: _____
DEPUTY CLERK

DISC-02491

## ATTACHMENT A-3

### Location to be Searched

### 803 Hunters Court, Brandon, Florida
### (TARGET RESIDENCE #3)

TARGET RESIDENCE #3 is a single story apartment in a multiple unit apartment complex. The exterior of the apartment has a tan colored exterior with brown trim. The apartment has a semi-private entryway and a maroon colored front door. The front door is partially obscured by a wooden structure, and the numbers 8-0-3 are affixed to the wooden structure.

22

## ATTACHMENT B-3

### Property and Items to be Seized

The property and items to be seized from TARGET RESIDENCE #3, located at 803 Hunters Court, Brandon, Florida, are as follows:

1. Evidence, contraband, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 2113(a), 2119, and 924(c), as described in the Affidavit, including but not limited to the following:

   a. Clothing and other items, such as black bags or canvas bags, that are of similar description to clothing worn or items used/taken during the credit union robberies and carjackings being investigated;

   b. Firearms and ammunition;

   c. United States currency, money bands, and other items related to storage of money at banks;

   d. Disguises worn during the credit union robberies and carjackings, such as wigs, and sunglasses;

   e. Electronic items such as cellphones, GPS navigation units, computers, and electronic file storage, digital or electronic notebooks/address books or other similar items that could contain search histories and location information pertaining to the credit union robberies and carjackings described in the Affidavit;

   f. Maps, notes, and other documents reflecting research on the location of the credit union robberies and carjackings;

   g. Receipts for the purchase of items used during the credit union robberies and carjackings;

   h. Receipts, deposit slips, checks, or other pieces of paper that contain demand notes, or which may have been utilized for demand notes, during the credit union robberies;

   i. Records relating to income and expenditure of money or wealth, books, receipts, notes, ledgers, and other papers relating to debts and sources of income; and

   j. Photographic images which may depict images of the suspects in the same or similar clothing worn during the credit union robberies; and

29

any images which may depict financial institutions that may have been robbed and/or targeted.

2.   Documents and records regarding the ownership and/or possession of TARGET RESIDENCE #3 limited to paid utility bills, paid telephone bills, or other similar bills.

30

AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Middle District of Florida

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>· 803 Hunters Court, Brandon, Florida | )<br>)<br>)<br>)<br>)<br>) |

Case No.  **8:20MJ1046AAS**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A-3

located in the _____ Middle _____ District of _____ Florida _____, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B-3

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2113(a), | Credit union robbery |
| 18 U.S.C. § 924(c), and | Use of a firearm during and in relation to a crime of violence, and |
| 18 U.S.C. § 2119 | Carjacking |

The application is based on these facts:
See attached affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

FBI SA James J. Bucenell
*Printed name and title*

Sworn to before me and signed in my presence.

Date: January 21, 2020

*Judge's signature*

City and state:  Tampa, Florida       Amanda Arnold Sansone, United States Magistrate Judge
*Printed name and title*

I CERTIFY THE FOREGOING TO BE A TRUE
AND CORRECT COPY OF THE ORIGINAL
CLERK OF COURT
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
BY: _____
DEPUTY CLERK

DISC-02495

I, James J. Bucenell, being duly sworn, depose and state the following:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Federal Bureau of Investigation (hereinafter "FBI"), and have been since December 2001. I am an investigative or law enforcement officer within the meaning of 18 U.S.C. Section 2510(7). As such, I am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. Section 2516. In my capacity as an FBI Special Agent, I have received training regarding the use of search warrants, including legal requirements which govern this investigative technique. In connection with my official duties as a Special Agent with the FBI, I investigate a variety of criminal violations of federal laws, including the investigation of armed robberies, carjackings, and conspiracies. During these investigations and others, I have seized cell phones, reviewed evidence from seized cell phones, and consulted with other agents and law enforcement officers who have seized and/or reviewed evidence from the cell phones. Prior to my employment with the FBI, I was employed with the Pasco County Sheriff's Office, New Port Richey, Florida, for eight years. This experience included four years as a detective assigned to various units within the Criminal Investigations Division.

2.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3.     This investigation involves a series of credit union robberies and carjackings between October 2018 and December 2019. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 2113(a) (credit union robberies), 18 U.S.C. § 924(c) (use of a firearm during and in relation to a crime of violence), and 18 U.S.C. § 2119 (carjacking) have been committed by the users of **TARGET PHONE #1** (727- 379-7831) and **TARGET PHONE #2** (813- 417-4214). A query of various law enforcement databases reveals that the current user of **TARGET PHONE #1** is **LEON GRANT, JR. ("LEON")**. According to law enforcement databases, **TARGET PHONE #1** is currently serviced by T-Mobile, USA (hereafter referred to as "T-Mobile"). A query of various law enforcement databases indicates that the current user of **TARGET PHONE #2** is **VICTOR RICARDO GRANT ("VICTOR")**. According to law enforcement databases, **TARGET PHONE #2** is currently serviced by Cellco Partnership d/b/a Verizon Wireless (hereafter referred to as "Verizon Wireless").[1]

4.     I submit this affidavit in support of a warrant to search residences owned by, and associated with **LEON** and **VICTOR**, more fully described in Attachments *A1-A3*, and for a search of **LEON** and **VICTOR**, who are more fully described in

---

[1] On January 10, 2020, surveillance units placed a call to **TARGET PHONE #1** while **LEON** was at a residence in St. Petersburg. Detectives were able to observe **LEON** look down at **TARGET PHONE #1** while holding his cellphone in his hand. The call was terminated. **TARGET PHONE #1** is registered to "Joe Clark." **TARGET PHONE #2** is registered to "Melessia Grant," who is the wife of **VICTOR**. Based on my training and experience, I know that it is common for criminals to have cell phones registered in someone else's name, particularly cell phones that they have on them while committing crimes.

2

DISC-02497

Attachments *A4-A5*.  Because there is probable cause to believe that LEON and

VICTOR used the residences more fully described in *Attachments A1-A3* to conspire,

plan for, carry out robberies of federally insured credit unions and carjackings, there is

probable cause to believe that a search of the residences more fully described in

*Attachments A1-A3* will lead to the recovery of evidence, contraband, fruits, and

instrumentalities of the aforementioned crimes, as described in *Attachments B1-B3*.

Additionally, because there is probable cause to believe that VICTOR and LEON are

the users of TARGET PHONE #1 and #2 and that they used these phones during the

commission of the robberies and carjackings outlined below, there is probable cause

to search them for these phones.

## BACKGROUND FACTS OF THE INVESTIGATION

5.      On October 22, 2018, shortly after 12:00 p.m., an unknown subject

("UNSUB") robbed the Mid-Florida Credit Union located at 825 West Brandon

Boulevard, Brandon, Florida.[2]  According to eyewitness statements and still shots

from video surveillance, the UNSUB appeared to be a black male, unshaven, with

black and grey dreadlocked hair, wearing a bright orange "traffic" vest over a white

long sleeved shirt, sunglasses, and camouflage colored pants.  The UNSUB

approached a credit-union teller ("Teller #1") and produced a demand note that

instructed the teller to give him large bills. Teller #1 showed the demand note to

another credit-union teller ("Teller #2"), who was holding a large amount of cash

from previous deposits. The UNSUB showed the tellers a handgun tucked into his

---

[2] Mid-Florida credit union is a state-chartered credit union that is federally insured by
the National Credit Union Administration Board.

DISC-02498

waistband, then placed a black semi-automatic handgun on the counter. Teller #2, fearing for the safety of Teller #1, gave the UNSUB the cash from his drawer. After getting the currency, the UNSUB produced a razor blade to cut open the money bands before placing the stacks of money into a bag. The UNSUB fled from the bank on foot and jumped a nearby fence. An eyewitness to the robbery described the UNSUB as being approximately 5'9" tall with a slender build, and whose dreadlocked hair appeared to likely be a wig. An internal audit conducted by Mid-Florida representatives discovered the UNSUB had stolen $28,000.

6.      On February 22, 2019, shortly after 3:00 p.m., an UNSUB robbed the Mid-Florida Credit Union located at 3202 West Waters Avenue, Tampa, Florida. According to eyewitness statements and video surveillance, the UNSUB appeared to be a black male, unshaven, with black and grey dreadlocked hair, wearing a blue checkered long sleeved shirt over a white shirt and dark jeans. The UNSUB approached the victim teller, who was accompanied by a trainer, and presented a check made out for $8,000. When the victim teller turned the check over for the endorsement, she noticed a demand note written on the back, instructing her to give the UNSUB all of the money from her drawer. After reading the note, the victim teller looked at the UNSUB who lifted his shirt, grabbed a black semi-automatic handgun from the front of his waistband, and laid it on the counter. While the victim teller complied with the UNSUB's demands, the UNSUB grabbed the handgun from the counter, placed it back into the front of his waistband, and produced a bag and began placing the currency into the bag. Prior to exiting the credit union, the UNSUB pointed the handgun at both tellers, verbally threatened

4

them, and exited the credit union. An eyewitness to the robbery described the UNSUB as being approximately 5'11'' tall, approximately 200 pounds, the dreadlocked hair appeared to likely be a wig, and three or four of the UNSUB's upper teeth were gold. An internal audit conducted by Mid-Florida representatives discovered the UNSUB had stolen approximately $19,658. Among the currency were bait bills that have been entered into the National Crime Information Center (NCIC) as stolen items.

7.     On June 19, 2019, at approximately 2:53 p.m., an UNSUB robbed the Mid-Florida Credit Union located at 4300 Park Boulevard, Pinellas Park, Florida. According to eyewitness statements and video surveillance, the UNSUB appeared to be a black male, unshaven, with black and blonde dreadlocked hair, wearing a long sleeved white shirt, sunglasses, and dark pants. The UNSUB approached the victim teller, who was accompanied by a trainer, with a black bag and green paper similar to a check. Once at the counter, the UNSUB produced the green check which instructed the victim teller to give him all of the money. The UNSUB lifted his shirt, grabbed a black semi-automatic handgun from the front of his waistband, and laid it on the counter. The UNSUB retrieved the demand note (check) and instructed the victim teller to get money from the drive through drawers. The UNSUB took the money from the counter, placed it into the black bag, and exited the credit union. An eyewitness to the robbery described the UNSUB as being 5'10"- 6'0" tall, approximately 200 pounds, and the dreadlocked hair appeared to likely be a wig. An internal audit conducted by Mid-Florida representatives discovered the UNSUB had stolen approximately $21,143.

5

8.     On August 26, 2019, at approximately 8:56 p.m., a 2010 black Nissan Maxima was stolen in front of Betty's Coin Laundry located at 8101 4th Street North, St. Petersburg, Florida by an armed UNSUB.  According to the victim, while placing clothing into the rear driver's side seat, a black male with shoulder length dreadlocks, wearing dark clothing, approached him.  The UNSUB was armed with a black handgun and pointed the gun at the victim's face and demanded the vehicle's keys.  The victim reached into his pocket, removed the keys, and threw them on the ground at the UNSUB's feet.  While the UNSUB picked up the keys, the victim ran inside the laundromat.  Once inside, the victim yelled to another customer inside that he had just been robbed, and shortly after, heard the vehicle drive away from the laundromat.

9.     On August 27, 2019, at approximately 2:28 p.m., an UNSUB robbed the Suncoast Credit Union located at 3234 Miller Road, Valrico, Florida.[3] According to eyewitness statements and video surveillance, the UNSUB appeared to be a black male, unshaven, with black and grey or blonde dreadlocked hair, wearing a long sleeved neon yellow shirt, and dark pants.  The UNSUB approached the victim teller with a black bag in his hand. The UNSUB placed the bag on the counter, handed the victim teller a demand note written on paper similar to a check, and pulled a black semi-automatic handgun from the front of his waistband. After reading the note, the victim teller obtained money from other teller windows and put it on the counter.  The UNSUB took back the demand note, placed the money into

---

[3] Suncoast Credit Union is a state-chartered credit union that is federally insured by the National Credit Union Administration Board.

DISC-02501

the black bag, and exited the credit union. An eyewitness to the robbery described the UNSUB as being approximately 5'7" tall and a medium build. The UNSUB fled the area in an older model black Nissan Maxima. Shortly after law enforcement arrived at the credit union, the black Nissan Maxima was located in a nearby parking lot. An inquiry of law enforcement databases revealed the vehicle had been stolen from Betty's Coin Laundry in St. Petersburg the day before (August 26, 2019). An internal audit conducted by Suncoast representatives discovered the UNSUB had stolen approximately $598.

10.    On October 9, 2019, at approximately 1:10 p.m., an UNSUB robbed the Mid-Florida Credit Union located at 29383 US Highway 19 North, Clearwater, Florida. According to eyewitness statements and video surveillance, the UNSUB appeared to be a black male, unshaven, with black dreadlocked hair, wearing a light colored long sleeved shirt, and black sunglasses. The UNSUB approached the counter and handed the victim teller a demand note written on paper similar to a receipt. While the victim teller was reading the note, the UNSUB pulled a black semi-automatic handgun from the front of his waistband, and began tapping the handgun on the counter. After reading the note, the victim teller obtained money from her cash drawer and placed the money on the counter. While the victim teller was obtaining the money, the UNSUB retrieved the note. An eyewitness to the robbery described the UNSUB as being approximately 5'10" tall and a medium build, and the dreadlocked hair appeared to likely be a wig. An internal audit conducted by Mid-Florida representatives discovered the UNSUB had stolen approximately $1,778.

7

DISC-02502

11.     On November 4, 2019, at approximately 11:22 p.m., a 2008 black Ford Mustang was stolen from Betty's Coin Laundry located at 8101 4th Street North, St. Petersburg, Florida by an armed UNSUB. According to the victim, the UNSUB approached him as he was sitting inside the vehicle, armed with a handgun. The victim described the handgun as a revolver, which seems to be different than the handguns used in the above described offenses. The UNSUB instructed the victim to leave the keys in the vehicle, and demanded the victim's cellphone and wallet. During the encounter, the UNSUB searched the victim's pockets, and as the victim tried to flee the area, he was shot twice by the UNSUB. The victim survived the shooting and was able to describe the UNSUB as a black male, with shoulder length dreadlocks, and dressed in all dark clothing. Video surveillance captured an image of the UNSUB, however, because of the poor quality of the video, law enforcement could not identify the UNSUB. According to the Vehicle Identification Number (VIN), the vehicle was manufactured in Michigan.

12.     On December 6, 2019, at approximately 11:45 a.m., an armed Brinks guard was in the process of making a delivery of $120,000 to the ATM at the front entrance of the GTE Federal Credit Union located at 101 East Bloomingdale Avenue, Brandon, Florida.[4] As the Brinks guard was standing in front of the ATM, an UNSUB with similar physical characteristics and wearing dreadlocks and sunglasses approached the Brinks guard armed with a black semi-automatic handgun. The guard and the UNSUB got into a physical struggle over the money,

_____

[4] GTE Federal Credit Union is insured by the National Credit Union Administration Board.

8

DISC-02503

which was contained in a bag.  At this time, a citizen who was parked in a vehicle near the ATM, got out of his vehicle and attempted to intercede in the physical struggle between the UNSUB and the Brinks guard.  During the physical struggle, the UNSUB shot the security guard and the citizen.  The UNSUB grabbed the canvas bag and fled to a black Ford Mustang which left the parking lot and the area. A short time later, the vehicle was located in an apartment complex (Avenue at Creekbridge Apartments, 1002 Creekbridge Road, Brandon, Florida) a short distance from the credit union.  The vehicle was found abandoned in a parking lot at the end of the complex with no outlet. When law enforcement queried the license plate affixed to the vehicle, officers discovered it was the 2008 black Ford Mustang that was taken on November 4, 2019, from Betty's Coin Laundry located at 8101 4th Street North, St. Petersburg, Florida, when the UNSUB shot the owner of the vehicle.

13.     Surveillance videos and photographs do not conclusively depict whether the same UNSUB is responsible for committing all of the aforementioned armed crimes. However, the *modus operandi* and appearance of the UNSUB are similar.  A review of witness statements and video surveillance, suggest that the robber(s)/carjacker(s) appears to be of similar height, likely wears the same type of dreadlocked wig, has targeted credit unions, utilizes checks/receipts to construct demand notes for the credit union robberies, and, generally, uses the same handgun to commit the above crimes, except for the most recent carjacking.

14.     On December 16, 2019, search warrants were authorized for the historical cell tower data for **TARGET PHONE #1** and **TARGET PHONE #2** for

9

the period between October 2018 and December 2019. Additionally, on December 16, 2019, and January 15, 2020, search warrants were authorized for prospective location data and a pen register for **TARGET PHONE #1** and **TARGET PHONE #2.**

    15.    According to the Florida Driver and Vehicle Database (hereafter referred to as "DAVID"), LEON's address is 6267 12th Street South, St. Petersburg, Florida (**TARGET RESIDENCE #1,** more fully described in *Attachment A-1*). On December 12, 2019, at approximately 1:00 p.m., law enforcement surveillance units observed **VICTOR** arrive at **TARGET RESIDENCE #1** in a dark-colored Chevrolet Impala. **VICTOR** parked the vehicle in the driveway, exited the vehicle and entered the residence. Later that date, surveillance units observed **LEON** arrive at **TARGET RESIDENCE #1** in a dark blue Dodge truck. **LEON** was with another male and they met with **VICTOR** in the front yard of the residence. Also, on December 11, 2019, **LEON** was arrested for a DUI. The Complaint/Arrest Affidavit lists LEON's address as **TARGET RESIDENCE #1.** Property appraisal records show that **TARGET RESIDENCE #1** is owned by someone other than **LEON** or **VICTOR.** Officers recently saw a vehicle registered to the owner at **TARGET RESIDENCE #1.** Based on records that I have seen, I believe that the owner of **TARGET RESIDENCE #1** is **LEON** and **VICTOR**'s stepfather. During the time period of December 17, 2019 through January 17, 2020, and as a result of the December 16 prospective-location warrant discussed above, GPS data from **TARGET PHONE #1** place it in the vicinity of **TARGET RESIDENCE #1**

DISC-02505

approximately four times with the most recent date being December 31, 2019, as of January 17, 2020.

16.    According to the Florida DAVID, Yasmin Nicole KING's address is 2425 10th Street South, St. Petersburg, Florida (**TARGET RESIDENCE #2,** more fully described in *Attachment A-2*). I believe KING and **LEON** are in a boyfriend/girlfriend relationship, and have been together for several years. On June 19, 2016, **LEON** was arrested for Fleeing to Elude, Reckless Driving and Driving while license suspended. **LEON** was driving a 2004 Volkswagen registered to KING. When questioned by law enforcement officers, KING stated that **LEON** was her boyfriend. Through analysis of Pen Register data from approximately December 17, 2019 through January 14, 2020, **LEON** has made or received more than 149 calls from KING. I believe **LEON** often stays at KING's residence, as indicated by location data for **TARGET PHONE #1** as recently as January 17, 2020. During the time period of December 17, 2019, through January 17, 2020, and as a result of the December 16 prospective-location warrant discussed above, GPS data from **TARGET PHONE #1** place it in the vicinity of **TARGET RESIDENCE #2** approximately 155 times with the most recent date being January 17, 2020, as of that same date. On January 20, 2020, an officer on surveillance saw **LEON** at **TARGET RESIDENCE #2.**

17.    According to the Florida DAVID, **VICTOR's** address is 803 Hunters Court, Brandon, Florida (**TARGET RESIDENCE #3,** more fully described in *Attachment A-3*). Since December 13, 2019, video surveillance was established near **TARGET RESIDENCE #3** and has confirmed that address as **VICTOR's**

11

residence. Further, two tracking devices were placed on two vehicles registered to

VICTOR. A tracker was installed on a blue 2009 Chevrolet Impala on January 2,

2020, and a tracker was installed on a red 2016 Dodge Charger on January 8, 2020.

The tracker on the Impala shows that it has been dormant since installation. The

tracker on the Charger shows that it has come-and-gone from **TARGET**

**RESIDENCE #3** on multiple occasions. The Charger is registered to **VICTOR**.

<u>PROBABLE CAUSE</u>

18.     On February 22, 2019, at approximately 1:57 p.m., **TARGET**

**PHONE #1** and **TARGET PHONE #2** both connected with a cell tower in the

vicinity of 2425 10th Street South, St. Petersburg, Florida.[5]  At approximately 2:56

p.m., **TARGET PHONE #1** and **TARGET PHONE #2** connected with cell towers

---

[5] The word "vicinity" denotes different things depending on the type of data I
discuss. Paragraphs 16-17 discuss GPS data showing that **TARGET PHONE #1**
was in the vicinity of **TARGET RESIDENCE #1** and **#2**. This data is fairly
precise, often showing a phone's location within several meters. Paragraphs 19-26
discuss **TARGET PHONE #1** and **#2** connecting to cell towers within the vicinity
of certain locations. In this case, the cell towers are sometimes up to a few miles
from the locations. Cell towers often service an area extending several miles from
the cell tower. What is of note here is that there are so many connections to towers
within the vicinity of critical events and locations in this case, near the time of those
events, and so many connections to towers in the vicinity of **TARGET**
**RESIDENCE #2** and **#3** shortly after and before those events. That fact is
especially noteworthy given the wide geographical range of the relevant locations.
**TARGET RESIDENCE #2** is in southern Pinellas County, but **TARGET**
**RESIDENCE #3** is in eastern Hillsborough County. Similarly, the robberies and
carjackings in this case span from southern Pinellas and central Pinellas County to
northern and Eastern Hillsborough County. In reviewing the cell tower data, no
other phones have collectively hit on nearly as many of the towers in the vicinity of
the relevant events, near the time of the relevant events, as **TARGET PHONE #1**
and **#2**.

12

in the vicinity of the Mid-Florida Credit Union located at 3202 West Waters

Avenue, Tampa, Florida. The armed robbery of the Mid-Florida Credit Union

occurred shortly after 3:00 p.m. Subsequent to the robbery, both phones were

connected with a cell tower in the vicinity of **TARGET RESIDENCE #2**.

19.     On June 18, 2019, at approximately 9:25 p.m., **TARGET PHONE #1**

connected with a cell tower in the vicinity of **TARGET RESIDENCE #2**. At

approximately 9:25 p.m., **TARGET PHONE #2** connected with a cell tower in the

vicinity of **TARGET RESIDENCE #3**. On June 19, 2019, at approximately 12:00

a.m., a 2015 white Hyundai Accent was stolen from the Wawa convenience store

located at 7408 East Hillsborough Avenue, Tampa, Florida. At approximately 12:04

a.m., **TARGET PHONE #1** and **TARGET PHONE #2** connected with cell towers

in the vicinity of the Wawa convenience store. Subsequent to the theft of the vehicle,

**TARGET PHONE #1** and **TARGET PHONE #2** connected with a cell tower in

the vicinity of **TARGET RESIDENCE #2**.

20.     On June 19, 2019, at approximately 2:53 p.m. the Mid-Florida Credit

Union located at 4300 Park Boulevard, Pinellas Park, Florida, was robbed.

**TARGET PHONE #1** connected with a cell tower in the vicinity of the Mid-Florida

Credit Union shortly after the robbery. An eyewitness to the armed robbery was able

to provide law enforcement a description of the getaway vehicle and a partial vehicle

tag number. Subsequent to a search of the area, law enforcement recovered a vehicle

a short distance from the robbery scene, and identified it as the vehicle stolen from

the Wawa convenience store in Tampa (Florida) the day before the credit union

robbery.

13

21.     On August 26, 2019, at approximately 8:38 p.m., **TARGET PHONE**
**#2** connected with a cell tower in the vicinity of 8101 4th Street North, St. Petersburg,
Florida.  At approximately 8:55 p.m., an armed carjacking occurred at 8101 4th Street
North, St. Petersburg, Florida.  At approximately 9:24 p.m., **TARGET PHONE #2**
connected with a cell tower in the vicinity of **TARGET RESIDENCE #3**.

22.     On August 27, 2019, at approximately 1:23 p.m., **TARGET PHONE**
**#1** and **TARGET PHONE #2** connected with a cell tower in the vicinity of
**TARGET RESIDENCE #3**.  At approximately 2:28 p.m., an armed robbery
occurred at the Suncoast Credit Union located at 3234 Miller Road, Valrico, Florida.
At approximately 2:34 p.m., **TARGET PHONE #1** connected with a cell tower in
the vicinity of the Suncoast Credit Union.  At approximately 3:52 p.m., **TARGET**
**PHONE #1** and **TARGET PHONE #2** connected with a cell tower in the vicinity of
**TARGET RESIDENCE #3**.

23.     On October 9, 2019, at approximately 10:18 a.m., **TARGET PHONE**
**#2** connected with a cell tower in the vicinity of the Mid-Florida Credit Union
located at 29383 US Highway 19 North, Clearwater, Florida.  At approximately
11:24 a.m., **TARGET PHONE #1** connected with a cell tower in the vicinity of
**TARGET RESIDENCE #2**.  At approximately 1:10 p.m., an armed robbery
occurred at the Mid-Florida Credit Union, 29383 US Highway 19 North,
Clearwater, Florida.  At approximately 1:24 p.m., **TARGET PHONE #1** connected
with a cell tower in the vicinity of the Mid-Florida Credit Union.

24.     On November 4, 2019, at approximately 10:46 p.m., **TARGET**
**PHONE #1** connected with a cell tower in the vicinity of **TARGET RESIDENCE**

14

DISC-02509

**#2**. At approximately 10:57 p.m., **TARGET PHONE #1** connected with a cell tower in the vicinity of 8101 4th Street North, St. Petersburg, Florida. At approximately 11:22 p.m., an armed carjacking occurred at 8101 4th Street North, St. Petersburg, Florida, and the victim was shot by the UNSUB. Shortly after the carjacking, at approximately 11:23 p.m. and 11:24 p.m., **TARGET PHONE #2** connected with cell towers just to the north of the shooting scene. Approximately an hour after the shooting, **TARGET PHONE #2** connected with a cell tower in the vicinity of **TARGET RESIDENCE #3**.

25.     On December 6, 2019, at approximately 11:45 a.m., an armed robbery of a Brinks security guard occurred at the GTE Federal Credit Union located at 101 East Bloomingdale Avenue, Brandon, Florida. The Brinks guard and a citizen were shot by the UNSUB during the robbery. At approximately 12:18 p.m., **TARGET PHONE #2** connected to a cell tower in the vicinity of the GTE Federal Credit Union and **TARGET RESIDENCE #3**. Several hours after the robbery, **TARGET PHONE #1** and **TARGET PHONE #2** connected with a cell tower in the vicinity of **TARGET RESIDENCE #2**.

26.     According to Verizon Wireless, there was no historical cell tower data available for **TARGET PHONE #2** for the Mid-Florida Credit Union robbery that occurred on October 22, 2018, due to the expiration of the Verizon Wireless data retention period. Through analysis of historical cell tower data, **TARGET PHONE #1** was not in the vicinity of the Mid-Florida Credit Union (825 West Brandon Boulevard, Brandon, Florida) when it was robbed shortly after 12:00 p.m on October 22, 2018. However, during the investigation of the robbery at the Mid-Florida Credit

15

Union, law enforcement officers obtained video surveillance from a nearby business that showed a dark colored vehicle, similar to a Chevrolet Impala, backed into a parking space behind the business near the dumpster, shortly before the robbery. As noted previously, officers on surveillance have seen **VICTOR** in a dark-colored Impala as recently as December 2019. A black male wearing a white shirt with an orange reflective top, similar to clothing worn by the UNSUB who robbed the Mid-Florida Credit Union, exited the vehicle and walked across the parking lot. According to the video surveillance, shortly after the time of the robbery, a subject jumped over a fence, entered the vehicle and the vehicle drove away. Law enforcement officers were unable to determine the identity of the Florida license tag assigned to the vehicle.

27.     I note that this investigation has been the subject of an extensive public outreach campaign. For instance, a number of billboards in the Tampa Bay area display a still photo of the UNSUB, a tip line, and a large cash reward. This tip line has generated numerous leads. To my knowledge, no tip has identified **TARGET PHONE #1** or **#2**. Some tippers have identified suggested suspects, and to my knowledge, none has identified **VICTOR** or **LEON**. Additionally, one tipper was very confident in her identification. She worked at a radiology center and she described someone that she said looked exactly like the UNSUB pictured on the billboard. She also described a number of bizarre things this individual did that suggested that he was trying to hide his identity, such as requesting that she shred the photocopy that he had given her of his license. This tip led to a search warrant of that individual's home. After meeting the individual and based on subsequent events (*e.g.*,

16

the December 6 robbery occurred a few hours after the conclusion of the search of this individual's home), law enforcement decided that this reported person is unlikely to be the UNSUB.

28.    I also note that DNA swabs have been taken from the scenes of the robberies and from the recovered carjacked/ stolen cars. These swab have almost all been processed. They have been compared to DNA found on a cup that law enforcement has seen **VICTOR** use. The DNA from the cup does not match DNA found at the robbery crime scenes or from the stolen/carjacked cars. Based on my training and experience, DNA profiles are not always able to be extracted from crime scenes. For example, bank counters are often touched by multiple people. Multiple people leaving behind DNA on a surface inhibits a DNA analyst's ability to extract a DNA profile that can be processed. Similarly, just because someone touches a surface does not mean that they leave behind enough DNA for analysts to be able to identify a profile that can be analyzed. Additionally, the UNSUB appeared to take steps to conceal or destroy his DNA. For instance, the carjacked Mustang that was recovered after the December 6 robbery appears to have been doused in an unknown substance, which had the potential to diminish the likelihood of extracting DNA.

29.    Based on my training and experience, individuals who commit criminal activity, such as robberies and other related offenses, store proceeds of that activity, as well as other items used to commit that criminal activity, in their residences or other residences wherein they spend a considerable amount of time. There is probable cause to believe that is true in this case, particularly given the serial nature of the robberies, along with the similarity of the *modus operandi*, and the

17

location of the historical cell tower data for **TARGET PHONE #1** and **TARGET PHONE #2** both before and after the aforementioned robberies.

30.     Based on my training and experience, I know that robbers and carjackers often carry cell phones on them. Frequently, robbers use lookouts to help them commit robberies. While the robber is in the process of setting up, committing, and getting away from the robbery, a lookout often communicates with a robber to advise him of observed factors that would facilitate the robbery successfully, such as the presence of police. Robbers also often use phones to plan robberies with their co-conspirators. There is probable cause to believe that **LEON** and **VICTOR** used **TARGET PHONE #1** and **TARGET PHONE #2** to help facilitate the carjackings and robberies in this case, given the information that is outlined above. Based on my training and experience, I also know that robbers and carjackers, as well as people generally, often keep cell phones in their home and on their person.

DISC-02513

31.     Based on the foregoing, there is probable cause to believe that **TARGET RESIDENCE #1**, **TARGET RESIDENCE #2**, and **TARGET RESIDENCE #3**, contain evidence, contraband, fruits, and instrumentalities of the aforementioned crimes.  Accordingly, I respectfully request that the Court issue a search warrant for **TARGET RESIDENCE #1**, **TARGET RESIDENCE #2**, and **TARGET RESIDENCE #3**.  Based on the foregoing, there is also probable cause to search **LEON** and **VICTOR** for cell phones.[6]

Special Agent James Bucenell
Federal Bureau of Investigation

Sworn to and subscribed before me
this 21 day of January 2020, in Tampa, Florida

AMANDA ARNOLD SANSONE
United States Magistrate Judge

---

[6] Any seized phone will be checked to see if it is **TARGET PHONE #1** or #2. Specifically, an officer will call the numbers associated with **TARGET PHONE #1** and #2 and see if the call comes through on a seized phone.  In the event that a seized phone is determined to be **TARGET PHONE #1** or #2 and absent the obtaining of consent, a search warrant will be sought for the phone.  Should a seized phone not be powered on, an officer will turn it on for purposes of calling it and charge it as well, if necessary.

19

DISC-02514

## <u>ATTACHMENT A-3</u>

### Location to be Searched

### 803 Hunters Court, Brandon, Florida
### (TARGET RESIDENCE #3)

TARGET RESIDENCE #3 is a single story apartment in a multiple unit apartment complex.  The exterior of the apartment has a tan colored exterior with brown trim. The apartment has a semi-private entryway and a maroon colored front door.  The front door is partially obscured by a wooden structure, and the numbers 8-0-3 are affixed to the wooden structure.

22

DISC-02515

## ATTACHMENT B-3

### Property and Items to be Seized

The property and items to be seized from TARGET RESIDENCE #3, located at 803 Hunters Court, Brandon, Florida, are as follows:

1.  Evidence, contraband, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 2113(a), 2119, and 924(c), as described in the Affidavit, including but not limited to the following:

    a.  Clothing and other items, such as black bags or canvas bags, that are of similar description to clothing worn or items used/taken during the credit union robberies and carjackings being investigated;

    b.  Firearms and ammunition;

    c.  United States currency, money bands, and other items related to storage of money at banks;

    d.  Disguises worn during the credit union robberies and carjackings, such as wigs, and sunglasses;

    e.  Electronic items such as cellphones, GPS navigation units, computers, and electronic file storage, digital or electronic notebooks/address books or other similar items that could contain search histories and location information pertaining to the credit union robberies and carjackings described in the Affidavit;

    f.  Maps, notes, and other documents reflecting research on the location of the credit union robberies and carjackings;

    g.  Receipts for the purchase of items used during the credit union robberies and carjackings;

    h.  Receipts, deposit slips, checks, or other pieces of paper that contain demand notes, or which may have been utilized for demand notes, during the credit union robberies;

    i.  Records relating to income and expenditure of money or wealth, books, receipts, notes, ledgers, and other papers relating to debts and sources of income; and

    j.  Photographic images which may depict images of the suspects in the same or similar clothing worn during the credit union robberies; and

29

DISC-02516

any images which may depict financial institutions that may have been robbed and/or targeted.

2.   Documents and records regarding the ownership and/or possession of TARGET RESIDENCE #3 limited to paid utility bills, paid telephone bills, or other similar bills.

30

DISC-02517